Ex parte Banks.

---

## EX PARTE BANKS.

[APPLICATION FOR BAIL AFTER ITS REFUSAL BY CIRCUIT JUDGE.]

1. *Bail in capital cases.*—Under the provisions of the constitution (Art. I, § 17) and laws (Code, §§ 3669-70), a person indicted for murder is entitled to bail, as a matter of right, unless the court to which the application is made is of opinion, on the evidence adduced, that he is guilty of murder in the first degree; and if the application for bail is made to a circuit judge, and is by him refused, the evidence in the case may be set out on exceptions (Code, § 3673), and application made thereon to the supreme court.

2. *Murder in the first degree not here shown.*—Upon the evidence set out in the bill of exceptions (for which in full see statement of the case), the defendant was held entitled to bail as a matter of right, because the court could not, upon that evidence, say that he was guilty of murder in the first degree, as defined by section 3080 of the Code.

3. *Amount of bail.*—That the defendant is a man of fortune is a fact which may well be considered in fixing the amount of his bail.

APPLICATION by Thomas G. Banks, under section 3673 of the Code, for bail. The petition, with the accompanying exhibits, shows that the prisoner was indicted, in the city court of Mobile, at its November term, 1855, for the murder of Wm. H. Trone; that a trial has never been had under said

7

indictment; that on the 26th day of February, 1856, he was brought, on *habeas corpus*, before the Hon. C. W. Rapier, the judge of the sixth judicial circuit, by whom his application for bail was heard and denied; and that the evidence adduced on the hearing was committed to writing, and embodied in a bill of exceptions which is made a part of the present application. The evidence set out in the bill of exceptions, so far as it has any bearing on the points decided by this court, is as follows:

W. W. Hill.—[*Sworn by defendant.*] "Was present at the death of Trone. Was by the side of Trone and Banks at the time. Walked into the Battle-House bar, and found Banks with his arm around the shoulder of R. G. McMahan. Was in the act of walking up to Banks, and putting my hand on his shoulder, and Mr. Mullen at that moment walked up. McMahan was about to leave the bar-room at the time Mullen came up. Trone walked up at that moment, spoke to Banks, and said, 'How d'ye do?' Banks replied in same manner, and Trone asked him how he had been; he replied, he felt pretty well, though some one had been interfering with him. I spoke to Mr. Mullen after he made that remark; don't recollect what I said to him. The next thing I saw was the pistols: Banks had a pistol in each hand, raised up in front of his breast; and the pistol he had in his right hand fired, and killed Trone. Trone remarked, that he was shot. Banks said, 'Have I shot him?' and said, 'I would not have done it for my life.' They met, apparently as friendly as men could meet. He held the pistols as if he had no idea they would go off. He was telling Trone how he had been imposed on by some one. He appeared to have been recently badly beaten; his face was much bruised. [*Cross-examined by solicitor.*] I was present, also McMahan, before the killing. Mullen was on my right, Banks on my left, and Trone on the left of Banks. I was looking at Mullen at the time the pistol fired. After Banks said he had been beaten, he drew the pistols. I did not hear Banks ask Trone to take a drink. I am sure the language of Banks was, that he would not have killed Trone for his life. I did not hear him say, he thought he had killed Horace Buckley, or anything of that sort: if he had said so, I would have heard it. I think I made the

same statements before the coroner. I suppose it was about three minutes from the time I spoke to Mullen that the pistol fired. Trone asked Banks how he was ; Banks said, he felt pretty well, but that he had been badly beaten ; and Trone asked him who had done it. I at that time turned, and spoke to Mullen ; and don't know what reply Banks made, and don't know what words passed between them from that time until the pistol fired. Banks had two pistols; the one with which he killed Trone was the largest; it was a percussion pistol. · I think the ·cock was underneath; am not positive about that: did not examine the pistol, and do not know whether it has to be cocked to fire it off. (The pistol was here produced, and identified by the witness.) [*Re-examined by defendant.*] Myself, Mullen, Banks and Trone were all in a group. I just turned myself towards Mullen. The conversation between Banks and Trone was friendly, and, if it had changed to an angry tone, would have arrested my attention. They appeared to be glad to meet each other. Banks held the pistols as if he was showing them, and not in a manner as if he was going to use them. Banks was very drunk."

J. N. Mullen.—[*Sworn by defendant.*] " I was present at the death of Trone. Was on · that evening passing through the bar-room of the Battle-House, going into the bath-room, and met Mr. Hill, and spoke to him. About the same time, or very soon after, Banks came up, and spoke to some one,— whom, I did not at that time know. Their greeting appeared to be friendly; and when I heard the voice, I recognized it as that of Trone. I was engaged in conversation with Mr. Hill. Hill spoke to Banks, and held out his left hand to him: I had hold of Hill's right hand. About that time I thought I saw Banks move his arm, and almost instantly heard the report of the pistol. I then turned, and saw Trone, and Banks, with his right hand extended towards Trone, with a pistol in his hand; and as soon as I could see Trone distinctly, his hand was up to his breast. The first thing I heard said was Trone's exclamation, ' My God, gentlemen, it is too bad that I should be killed so.' During this time, not known whether or not there was a quarrel, and seeing Trone's hands to his breast, and thinking he was about to draw a weapon,

I moved down towards the centre of the room, and then saw that he was very bloody. Banks appeared to be very much confused, and, I thought, by this time appeared to be pretty much sobered; and went and laid his pistol down on the box, or something of that kind, and turned and met Trone, and took him by the arm, and went with him out at the door, and asked once or twice where he wanted to go to, and said that he would take him anywhere, or do anything for him. When they came out, I discovered that Trone was sinking, and stepped up to him, and caught him by the right hand and arm, and let him down against the wall and on the pavement. The crowd then began to come up, and I left, and went into Mr. Murray's. Banks had hold of him when he came out at the door; I think he let go of Trone about the time we let him down. I took Banks to be very drunk when I met him in the bar-room. I don't think more than ten minutes elapsed from the time Banks came in until I went away. [*Cross-examined by the solicitor.*] This occurred about 7 o'clock in the evening. I was near the fire-place, on the north side of the bar-room. There were probably ten or fifteen persons, or more, in the room. I did not pay much attention to the persons there. This is a public bar-room, and I presume a good many people go there. My impression is that it was a friendly greeting, as 'How are you, old fellow?' or something of that sort; don't recollect distinctly what it was that was said; think Banks spoke to Trone first, but am not certain; don't recollect what Trone said to Banks; did not hear Banks ask Trone to take a drink; think it was not more than two or three minutes, if that much, from the meeting of Banks and Trone until the pistol fired, but cannot say positively, as I was paying no attention at all to what they were saying; don't know what the words were that passed between Trone and Banks between the time of the accosting and the firing of the pistol. Banks was standing, after the pistol fired, with his arm extended towards Trone in a nearly horizontal position, with the muzzle of the pistol rather pointed downwards. I was not looking in the direction of Banks when the pistol fired; and turned around as soon as I could, and saw the pistol in the position above described. My impression was, at the time, that every one in the room ran out when the pistol

fired, except Trone, Banks, and myself. I did not hear Banks say he would not have shot Trone for his life. I did not see any one nearer, or so near, to Banks and Trone after the firing, as myself. There might have been some persons behind the screen. My impression was, at the time, that Hill went out at the north door of the room when the pistol fired. I have known Mr. Banks, by sight, some three years. (The witness was here asked by the solicitor whether he had ever seen Banks, when drunk, commit any acts of violence; to which question the defendant's counsel objected. The witness answered that he had not.)"

A. A. Sassaman.—(*Sworn by defendant.*)  " Was not present when Trone was shot; found him in the street. When I came up, Banks had hold of Trone, and was saying, ' Trone, I did not intend to kill you,' or ' did not go to kill you,' or something of that kind—do not now remember the exact words. Banks was easing Trone down. [*Examined by the solicitor.*] Trone was standing on the pavement, in front of the Battle-House, and falling in towards the door-step.

Richard Jackson.—[*Sworn by defendant.*] " Was not present when Trone was shot; got in a few seconds afterwards. Shortly after the pistol fired, I stepped into the bar-room, and saw Banks take Trone by the arm, and said to him, ' It was accidental you know, Trone, we have always been the best of friends.' About that time they stepped out at the door, and Trone attempted to sit down, but, instead of sitting down, he fell. Banks then called for help to get his (Trone's) overcoat off. In a very few minutes a good many were asking who it was that shot; and Banks said, ' I am the man that shot—T. G. Banks is my name.' He was arrested very soon after this, and taken off. I don't recollect what Banks said when he said it was him that shot, but think he said he had almost as soon have shot a brother. I heard him use these words, but don't know whether it was at that moment or not; it was before he was taken away by the arresting officer. [*Cross-examined by the solicitor.*] I have known Banks about three years. Knew Trone; knew him better, if anything, than I did Banks. When I got in, they were not more than half way from the spot where Trone was shot to the door. I remained with Trone until Banks was arrested. I don't

think I saw the pistols at that time. I had seen Banks, I think, about ten minutes before the shooting occurred; he had a couple of pistols at that time. I have not seen Banks since his arrest, until to-day."

Horace Buckley.—[*Sworn by defendant.*] "Was not present when Trone was shot. I crossed the street immediately on hearing the report of the pistol, and met Trone coming out of the house, and assisted in laying him down. About that time Banks came up, and said, 'My God, Horace, I did not intend to do it;' and took hold of Trone, and assisted in laying him down. When some one shoved him back, he then said, 'I did it, but did not intend to do it; myself and Banks have always been friendly.'"

John W. Davis.—[*Sworn by defendant.*] "Was not present when Trone was shot; was standing in the door of the Patterson-House, and, on hearing the report of the pistol, walked across, and got on the pavement just as Trone was coming out of the Battle-House. In the confusion, I did not recognize any one; but about the time they laid Trone down, I recognized Banks stooping over him, and put my hand on him to attract his attention, and asked him who did it. He replied, 'It was me, Thomas G. Banks. I did not go to do it.' I then asked him who it was he had shot; and he said it was Horace Buckley. 'You know,' said he, 'John, I would not have shot him. I had as soon have shot a brother,' or some such remark as that. When they raised Trone up, I saw his face for the first time, and recognized him; and said to Banks that it was Trone he had shot. He replied, that it could not be Mr. Trone,—it must be Horace Buckley; and he frequently remarked to me, and to others then present, that he did not go to do it,—that he would not have done it for the world."

Mr. White.—[*Sworn by defendant.*] "It was in the evening, after sundown, on the day Trone was shot, that Banks got the arms, or pistols. (The pistols were here produced, and proved to be the same that Banks had, with one of which Trone was shot.) They were given to him to defend himself. I saw two men beating him, and ran to his assistance, and found him very badly beaten and bloody. I did not know the men, and Banks did not appear to know them. I gave him these pistols at that time, in consequence of this assault,

to. defend himself with.  I loaded one of the pistols myself, and do not know whether the other was loaded or not.  I had loaded the one on Tuesday evening before Trone was shot, which, I think, was on Thursday evening.  The other pistol I had borrowed from a friend.  The one I loaded was loaded merely for my own protection, and not with a view to give it to Banks to shoot any body.  I don't suppose that Banks knew anything about the charge that was in either of the pistols.  The pistol I borrowed had no cap on it at the time I gave it to Banks; I don't know whether it was loaded or not.  The other was loaded, and had a cap on it.  I have very seldom seen a man so bruised and cut up about the face as Banks was.  I had not seen Banks in Mobile until that evening.  I heard the men who had beaten Banks make some threats, but don't recollect what the words were; it was only one of them I heard make the threats; I did not know him, and have not seen him since."

Mr. Kounts.—[*Sworn by defendant.*]  "One of the pistols was handed to this witness, and he was asked if he recognized it; to which he answered, 'I do; it is mine.  I loaned it to Mr. White on the same evening that Trone was killed, a little after dark.  I had loaded it a long time before,—don't know when.  I happened to be moving that afternoon, and picked it up and put it in my pocket."

Patrick Divine.—[*Sworn by defendant.*]  "I was at the house where Banks was beaten on the day Trone was shot. I heard the noise, but did not see the fight.  He was badly beaten, and cut over the eye."

T. R. Vaughn.—[*Examined by the solicitor.*]  "I saw Trone shot.  There were about six persons in the room at the time. The first words that passed between Banks and Trone, were, Banks reached out his hand to Trone, to tell him good evening, and Trone shook hands with him.  I can't tell whether Banks, at that moment, had his pistols in his hands; he had them just before that.  Banks, after shaking hands, asked Trone to go up and take a drink with him; Trone thanked him, and said he could not go.  I did not understand anything else that was said between them.  They were from five to seven feet from me.  I saw Trone and Banks when the pistol was fired.  Banks had the pistol in his hand, with his

arm crooked, and the point of the pistol pointing upwards. Trone was nearly in front of him. I did not see the wound that was inflicted until after Trone was dead. I saw the blood running before he died. Some time after the firing of the pistol, I heard Banks say something. I think Banks went out of the room when the pistol fired; he disappeared from my sight. I stepped up to see if it was McMahan that was shot, and saw Trone with his hands up to his breast, and heard him say, ' Gentlemen, is not this too bad.' I was not acquainted with either Banks or Trone. I turned to take hold of Trone, and some one then came up and took hold of him, and I left the room. I did not hear Banks speak to Trone, in the house, after the shooting. I do not think he could have spoken to Banks (?) in the house, after the shooting, without my hearing it. He did not speak to him, in the house, after the shooting; if he spoke to him, it was at the door. Trone was about six feet in height. [*Cross-examined by defendant.*] There was considerable confusion and excitement after the firing. Immediately after the firing I stepped up to see if it was not McMahan who was shot. He had his arm around Banks' neck. I don't pretend to say that what other witnesses say they heard was not said, but that I did not hear it; my attention was not directed to what might be said. I don't know whether Banks had a pistol in his left hand when he fired or not; he had one in his right hand; he had two before the firing, one in each hand."

Dr. A. F. Follin.—[*Sworn by the solicitor.*] Wm. H. Trone was killed by a ball from a pistol, or gun. The ball entered about the collar-bone, in a parallel direction, and, coming in contact with the collar-bone, passed on, in an oblique direction, downwards. There were two balls. They did not penetrate, in a horizontal direction, more than the sixteenth of an inch. From the appearance of the wound, the pistol must have been in an elevated position, and been fired as it had a downward tendency, but discharged as it got upon a level descending. [*Cross-examined by the defendant.*] I only intend to state that the point of the pistol being elevated, and discharged while it was descending, was one of the ways it could have entered in the way it did. Any person who saw how it was done would be worth more than any speculation

by one who did not see it. [*Re-examined by the solicitor.*] If the point of the pistol was in an elevated position when the ball was discharged, it would have ranged upwards; but in this case the tendency of the balls was downward. The form of the collar-bone is rather flat. [*Re-examined by defendant.*] If the point of the pistol had been raised and was falling, or was depressed and being raised, the same result might have followed; or it might have occurred in twenty different ways."

R. H. Smith, with whom was W. Boyles, for the prisoner:

In this State, all offences are bailable, except murder in the first degree (Constitutition, art. 'I, § 17; Code, §§ 3669-70); and the rule of law is, that where there is doubt the prisoner must be bailed.—1 Bacon's Abr., 581; 1 Wheeler's Criminal Cases, 445-8; 3 East, 155; 5 Cowen, 50-60. To constitute murder in the first degree, under our statutes (Code, § 3080), the killing must have been willful, deliberate, malicious, and premeditated; or must have been done by an act greatly dangerous to the lives of others, and evincing a depraved mind regardless of human life. The facts of this case, as disclosed by the evidence, show an accidental killing. There is nothing on which to predicate malice: on the contrary, the friendship of the parties, the character of the conversation when the act occurred, and the conduct of the accused, repel the idea of intention to kill. The fact of drunkenness tends to repel premeditation; and the inference of premeditation, which might otherwise be drawn from the use of a deadly weapon, is repelled by the proof as to when, how, and for what purpose the pistols were obtained.—Wharton's Criminal Law, 251, 253; 1 Stra. 481; Commonwealth v. Jones, 1 Leigh, 611; 9 Humph. 670; 4 Yerger, 141; 10 Humph. 105-11; The State v. Bullock, 13 Ala. 413.

E. S. Dargan, with whom was M. A. Baldwin, Attorney General, *contra*:

The sheriff's return to the *habeas corpus* shows that the prisoner was confined in jail under an indictment for murder. If no other evidence had been adduced by the prisoner, there can be no doubt that bail would be refused; otherwise, all prisoners indicted for murder are *prima facie* entitled to bail,

and the *onus* is on the State to repel such presumption. The legitimate consequence is, that the prisoner, after indictment for murder, is not entitled to bail, if the evidence leaves it doubtful whether or not he is guilty of murder in the first degree; and hence, to entitle himself to bail, he must by evidence remove that doubt. This, in effect, is the ruling in McCrary's case, 22 Ala. 72. Does the evidence, then, adduced in this case, remove all doubt on this question? It seems that no one saw the shooting; but when the witnesses, the instant the report of the pistol was heard, cast their eyes on the prisoner, his arm was extended on a level with his shoulder, with the pistol slightly inclined downwards, and Trone was shot. How could the arm be raised and extended, the cock of the pistol drawn back, and the trigger pulled, without design, or by mere accident? A man is presumed to have intended the natural consequences of his acts; and the character of the instrument used has an important bearing on the question of intent. The prisoner's subsequent conduct and declarations, not being brought out against him by the State, are not admissible evidence in his favor.—Campbell's case, 23 Ala. 79. If there was intent, the act was willful; and, in the absence of all provocation, however slight, an intentional killing must be malicious. The additional words, " deliberate" and " premeditated," as used in the statute, are almost (if not entirely) synonymous; and if design and intention existed, and directed the act, it must have been premeditated.—Wharton's American Law of Homicide, pp. 372-4.

RICE, C. J.—By the Code, murder is divided into two degrees. Murder in the first degree may be punished with death, but murder in the second degree can be punished only by confinement in the penitentiary.

Section 3080 of the Code defines murder in the first degree as follows : " Every homicide perpetrated by poison, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, or which is committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery, or burglary, is murder in the first degree; so, also, every homicide perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other

than him who is killed, or perpetrated· by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive of life any particular individual."

By the provisions of our constitution and Code, the defendant is " entitled to bail as a matter of right," at our hands, unless we are of opinion, on the evidence, that he is guilty of murder in the degree which may be punished capitally—that is, in the first degree.—Const. of Ala. art. I, § 17; *Ex parte* McCrary, 22 Ala. Rep. 65; *Ex parte* Croom & May, 19 Ala. Rep. 561; Code, §§ 3669, 3670.

We cannot, upon the evidence before us, say that he is guilty of murder in the first degree. And upon that ground, we are unanimous in the opinion, that he is entitled to bail as a matter of right, independent of the other grounds relied on by the counsel for the defendant.

As the case will hereafter be tried by a jury, we will not incur the hazard of doing· injury either to the State or the defendant, by commenting upon the evidence, when our duty does not require us to make any further disclosure of our opinion than we have above made.

On the part of the defendant it is admitted that he is a man of fortune. This is a fact which may well be considered in fixing the amount of bail.

In consideration of the premises, it is ordered, that the defendant be admitted to bail; that the amount thereof be twenty thousand dollars; and that, upon his giving a written undertaking, signed by himself and at least two sufficient sureties, agreeing to pay to the State of Alabama twenty thousand dollars, unless he, the said Thomas G. Banks, appear at the next term of the city court of Mobile, and from term to term thereafter until discharged by law, to answer the offence of murder, to be approved by the sheriff of Mobile county, who is hereby directed to take bail under this order, that the sheriff may discharge the said Banks out of his custody.